HERBERT D. PUGATCH vs. SAUL A. STOLOFF & another[1]

No. 94-P-1044.

Middlesex. February 12, 1996. - October 31, 1996.

Present: ARMSTRONG, KAPLAN, & PERRETTA, JJ.

*Real Property,* Boundary, Adverse possession. *Adverse Possession and Prescription.*

In a claim for adverse possession of a portion of a contiguous lot, the actions of the owner in staking the corners of his lot, applying for a building permit and giving oral notice that the claimant's landscaped area along the boundary of the lots would be disrupted during construction did not amount to an entry sufficient to interrupt the adverse possession and to stop the running of the prescriptive period; the judge should have entered judgment in favor of the claimant. [540-544]

CIVIL ACTION commenced in the Superior Court Department on July 10, 1990.

The case was heard by *George A. O'Toole, Jr.,* J.

*Richard D. Wayne* for the defendants.

*Janet B. Fierman* for the plaintiff.

ARMSTRONG, J. This is a boundary dispute between the owners of two lots in Newton which, although fronting on different streets, share a common rear lot line. A judge in the Superior Court dismissed Pugatch's contract claim as well as the Stoloffs' claim to have acquired a substantial part of Pugatch's lot by adverse possession. We affirm in part and reverse in part.

The two lots were held in common ownership as a single lot by the plaintiff's mother prior to June 27, 1969. The lot was rectangular, fronted on Sun Hill Lane, and had a house, which the Stoloffs now own, at the Sun Hill Lane end of the lot. At the rear of the tended yard, the lot became wooded and overgrown and sloped sharply down to Parker Street.

[1]Rhoda F. Stoloff.

The lot contained 23,218 square feet, more than double the minimum lot size, 10,000 square feet, for construction of a single-family dwelling.

The plaintiff's mother decided to sell the house, reserving to herself enough of the wooded rear yard for future construction of a house by one of her children. To that end she caused a subdivision plan — more properly, a division plan, as it did not require planning board approval — to be filed, showing the lot bisected by a straight boundary line that ran parallel to both Sun Hill Lane and Parker Street. The two resulting lots, each roughly rectangular, contained 13,174 square feet (the Sun Hill Lane, or house lot) and 10,044 square feet (the Parker Street, wooded lot). She then conveyed the house lot to the Stoloffs by a deed that described the rear lot line by reference to the subdivision plan.[2]

The subdivision plan was not available at the closing; the Stoloffs first obtained it several months later. They offered testimony that the plaintiff's mother took them, when they were viewing the house, to the furthest reach of the tended yard and described the rear boundary line, with reference to a certain tree, as running about fifteen feet behind the tended yard. As to this conversation, the judge found only that, "[w]hether Mrs. Pugatch intended or not to give a precise description of the location of the lot line, the Stoloffs understood it was beyond the landscaped area where a path ran along the top of the slope, beyond the privet hedge."[3] When the Stoloffs, after the closing, received the subdivision plan referred to in the deed, they assumed it reflected the boundary line about as described (allegedly) by the plaintiff's mother. Had they measured, they would have discovered that the record boundary lay twenty-three feet nearer than described, lopping off a small, semicircular portion of their tended yard.

In 1988 Pugatch, who had become owner of the Parker Street lot after his mother's death, decided to build a deck house. In March, 1989, nineteen years and nine months after the Stoloffs had purchased the Sun Hill Lane lot, Pugatch engaged surveyors to determine the exact boundaries on the ground of his heavily wooded lot. The surveyors placed stakes

---

[2]The description of the sequence of conveyances is shortened to omit intra-familial transfers that are irrelevant to the issues on appeal.

[3]In this appeal the Stoloffs make no claim of misrepresentation or mutual mistake of fact, so the ambiguity of the finding is not of concern here.

at the four corners of the lot. In doing so they entered the disputed, twenty-three foot strip that the Stoloffs assumed belonged to them, but they did not enter the Stoloff yard, the rearmost curve of which projected into only a part of the strip. The judge seems to have credited the Stoloffs' testimony that they were unaware of these stakes until sometime early the following year.[4] In early May, 1989, Pugatch obtained a building permit for the deck house. His contractor, doing a "Dig Safe" check, learned that the Stoloffs' electric utility line ran across the Pugatch lot within the footprint of the proposed house. In late May or early June, Pugatch approached the Stoloffs about moving the electric service line, which the Stoloffs expressed a willingness to do. Pugatch and his wife testified that, in the same conversation, they informed the Stoloffs "that construction of his house would disrupt a portion of lawn and hedge [i.e., the semicircular projection] at the rear of the Stoloff property," and that the Stoloffs had indicated a willingness to cooperate in establishing a new "living screen" in the area. The Stoloffs denied that the subject of boundary line was raised in that conversation, but the judge credited the Pugatch version of the conversation. In the autumn of 1989 (note that we are now beyond the twenty-year prescription period measured from the onset of the Stoloff occupancy) Pugatch, apparently without consulting the Stoloffs, reached an agreement with the deck house contractor to relocate the house further back in his lot, in a manner that compromised the Stoloffs' privacy and view. The Pugatches obtained a new building permit.

In February, 1990, Saul Stoloff, unaware of these developments, telephoned Pugatch with an estimate, $1,500, he had received for relocating the electric service line, and Pugatch sent Stoloff a check for that amount. In April, 1990, Stoloff

---

[4]The judge found, specifically, that "[t]he [surveyors'] stakes installed in lot corners in March, 1989, were, as a matter of fact, sufficiently obvious to give abutting landowners notice of the Pugatch lot boundaries, including the rear boundary line. . . . [I]f the Stoloffs exercised the use and control over the property that they claim, the stakes put in in March . . . would have been obvious. In fact, the stakes were obvious to other neighbors, the Levines, and to various workers and contractors. They were sufficiently obvious to be seen by anyone who went near the area of the boundary they marked." These findings are consistent with the judge's conclusion that the Stoloffs did not in fact care for, as part of their yard, the wooded areas into which the rear boundary corner stakes had been driven.

returned from a trip to find that Pugatch's contractor had sprayed painted an orange line across his rear yard marking the record boundary and had dug out the part of the Stoloffs' lawn, privet hedge, and railroad-tie retaining wall that projected over the line. Stoloff objected and engaged his own surveyor, who confirmed the location of the record line. Stoloff informed Pugatch that he was asserting a claim of ownership by adverse possession and was suspending the order he had placed to relocate his electric service line.

This litigation followed. Pugatch jumped the gun, initiating the action with a claim for breach of contract for the Stoloffs' failure to live up to their agreement to relocate the electric service line. The Stoloffs counterclaimed with counts for adverse possession and trespass. They attempted to obtain a preliminary injunction to stop the work; this was denied, but the judge, we are told by the Stoloffs, warned Pugatch that he proceeded with construction at his own risk. This he did, and the Pugatches now live there. The record indicates that the Stoloffs moved their electric service line in August, after they were denied preliminary injunctive relief against construction of the house.[5]

While the record before us does not contain the chalk that the parties used at trial to depict graphically the areas in contention,[6] the judge's findings describe those areas in sufficient detail to enable us to understand the substance of his findings and rulings. The largest area in dispute was that between the Stoloffs' rear record boundary and the line, twenty-three feet further back, that the plaintiff's mother is said to have identified as the boundary line in 1969. This area is roughly 128 feet wide, the full extent of the yard, and contains 2,944 square feet. Within that is a smaller semicircular area, from the record rear boundary to the outer edge of the path that was at one time used to keep up fruit trees and ornamental trees and plantings that lay beyond the privet hedge that marked the end of the Stoloffs' lawn area. It

---

[5]The judge determined that Pugatch suffered no damage from the delay, and Pugatch's contract claim was dismissed. Pugatch has not appealed, so the case is before us solely on the Stoloffs' appeal from the judge's decision in Pugatch's favor on the counterclaims.

[6]Crucial testimony and, indeed, parts of the judge's findings use the points depicted on the chalk to describe boundary lines. Thus, the judge refers to the disputed area within the Stoloffs' tended yard as the "area shown on the chalk marked B for identification from point G to H to G."

contained 1,220 square feet. The smallest area claimed by the Stoloffs lay between the record boundary and the privet hedge, including a railroad-tie retaining wall that the Stoloffs installed to shore up the ground just behind the hedge. This last area — the yard area — contained 238 square feet.

The judge found on the basis of testimony, without a view, that the two large areas were "wild and unattended with no evidence of clearing or grading" in May, 1989, within the prescriptive period, with "no visible or apparent distinction on the Pugatch side of the hedge between the disputed area and the rest of the lot [i.e., the Pugatch lot]." The judge found that the Stoloffs had at times done some pruning or clearing behind the hedge but had not continuously maintained or cultivated it. "Their use of it was more consistent with sporadic use of neighboring property than with an assertion of dominion or ownership." Although conflicting, the testimony supported these findings, and the judge's ruling must stand that the Stoloffs' use of the two larger areas was not sufficiently pervasive to amount to adverse possession. Compare *Dow* v. *Dow*, 243 Mass. 587, 593 (1923); *Cowden* v. *Cutting*, 339 Mass. 164, 168 (1959); *Senn* v. *Western Mass. Elec. Co.*, 18 Mass. App. Ct. 992, 993 (1984). "Acts of possession which are 'few, intermittent and equivocal' do not constitute adverse possession." *Kendall* v. *Selvaggio*, 413 Mass. 619, 624 (1992), quoting from *Parker* v. *Parker*, 1 Allen 245, 247 (1861).

As to the smallest area claimed by the Stoloffs, the yard area, the judge's decision adverse to them was reached on a different basis. Following the general run of authority, the judge recognized that the Stoloffs' continuous maintenance of the lawn, the privet hedge, and railroad-tie retaining wall constituted possession sufficiently open, notorious, exclusive, and adverse, as to vest ownership in them if not interrupted for the prescriptive period. Compare *Lyon* v. *Parkinson*, 330 Mass. 374, 380 (1953); *Kershaw* v. *Zecchini*, 342 Mass. 318, 320-321 (1961); *Collins* v. *Cabral*, 348 Mass. 797, 797-798 (1965); *Shaw* v. *Solari*, 8 Mass. App. Ct. 151, 157 (1979); *Lebel* v. *Nelson*, 29 Mass. App. Ct. 300, 301-302 (1990); *MacDonald* v. *McGillvary*, 35 Mass. App. Ct. 902, 903-904 (1993). The judge ruled, however, that the Stoloffs' exclusive possession was cut short just before the end of the prescriptive period. The judge predicated this conclusion on four factors. In

his words, "The staking of the corners of the Pugatch lot in March, 1989, the application for and issuance of a building permit for the lot in May, 1989, the activity from April to June, 1989, on the lot (including parts of the disputed area) preparatory to construction, and Pugatch's oral notice to the Stoloffs in late May or early June about the likelihood of disrupting the Stoloff landscaping along the line where the two lots joined, together constituted a sufficient assertion by Pugatch of his right to the contested portion of the lot, including the area on the Stoloff side of the privet hedge, so that the Stoloffs' possession of any of the parcel, including that area of what they had treated as their yard on their side of the privet hedge, was no longer exclusive or uncontested."

The judge's conclusion, in our view, is at variance with authority and cannot be sustained. Two of the factors on which he relied cannot be given weight. The activity preparatory to construction of which the judge speaks was, in the prescriptive period, confined to portions of the disputed area that were, by the judge's findings, untended woodland beyond the privet hedge.[7] No activity occurred in the Stoloffs' tended yard, the boundary of which was distinct and well defined. Such activities could stop the running of the limitations period in the areas beyond the hedge, had the judge found that the period was running; but they did not extend to the yard area which the judge found that the Stoloffs occupied adversely. Compare *Rothery* v. *MacDonald*, 329 Mass. 238, 240 (1952). The territorial extent of an owner's reentry is a question of fact, *id.* at 240-241, but on the evidence here a finding that the activities preparatory to construction interrupted the Stoloffs' possession of their tended yard is clearly erroneous. The building permit must similarly be disregarded. Neither the application nor the issuance was brought to the Stoloffs' attention during the prescriptive period. They were not required by law to be notified, and they were not notified. To stop the running of the statute, the owner's entry, with

---

[7]The evidence at trial established that the plaintiff's agents walked only on the remainder of the Parker Street lot (i.e., beyond the hedge) during the prescriptive period which concluded on June 27, 1989. No trees were cleared from the Parker Street lot until November of that year at the earliest, and excavation and construction on the plaintiff's house did not begin until July, 1990. The activity preparatory to construction, including the plaintiff's application for and receipt of a building permit, did not impinge overtly on the Stoloffs' lawn area, so as to give them notice of a reentry.

few exceptions,[8] must be done openly on the land, so as to give notice of the interruption. See *Bowen* v. *Guild*, 130 Mass. 121, 123 (1881).

Pugatch's actions in having a survey conducted and stakes placed at the corners of the Parker Street lot on the common boundary during the period of the Stoloffs' adverse occupation in this context did nothing more than identify to those who knew of the stakes the location of that boundary. The corner stakes by themselves, set in the woods outside their yard, did nothing to alert the Stoloffs that the boundary line ran across their yard. Moreover, notice to an adverse possessor of the result of a survey, without more, is insufficient to establish such an exercise of dominion over the disputed area as to interrupt adverse possession. See *Van Allen* v. *Sweet*, 239 Mass. 571, 574 (1921). Compare *Proprietors of the Kennebeck Purchase* v. *Springer*, 4 Mass. 416, 418-419 (1808) (marking of land by surveyor does not constitute disseisin); *Slater* v. *Rawson*, 6 Met. 439, 447 (1843) (driving stakes around exterior of lot and erecting salt works on portion was not disseisin of true owner).

These holdings as to the limited effect of surveyors' stakes and marks, although not recent, are in line with authorities in other jurisdictions. See *New Orleans* v. *Peterson*, 142 So. 2d 174, 178 (La. Ct. App. 1962); *McIlwain* v. *Manville Forest Prod. Corp.*, 499 So. 2d 1138, 1141-1142 (La. Ct. App. 1986); *McDaniel* v. *Roy O. Martin Lumber Co.*, 560 So. 2d 676, 680 (La. Ct. App. 1990); *Delgado* v. *Burns*, 576 So. 2d 1075, 1078 (La. Ct. App. 1991); *Rosencrantz* v. *Shields, Inc.*, 28 Md. App. 379, 387-394 (1975); *Miceli* v. *Foley*, 83 Md. App. 541, 557-558 (1990); *Alukonis* v. *Kashulines*, 97 N.H. 298, 300 (1952); *LaFreniere* v. *Sprague*, 108 R.I. 43, 52-54 (1970). Contrast *Simmons* v. *Inhabitants of Nahant*, 3 Allen 316, 317 (1862) (placing of stakes, cedar posts, and the near completion of fence after survey sufficient to gain possessory title as against strangers); *Pierce* v. *Austin*, 651 S.W.2d 161, 162-163 (Mo. App. 1983) (placing of stakes connected by string and

[8]In Massachusetts, the filing of a petition to register title to land or a complaint to establish title to land immediately interrupts adverse possession of that land. See *McMullen* v. *Porch*, 286 Mass. 383, 388 (1934), and cases cited; *Sandwich* v. *Quirk*, 409 Mass. 380, 383, cert. denied, 502 U.S. 814 (1991); *Snow* v. *E.L. Dauphinais, Inc.*, 13 Mass. App. Ct. 330, 336 (1982). Compare G. L. c. 187, § 3, relative to notices to prevent easements.

posting of sign notifying adverse possessors that they could not use area so fenced off was sufficient to interrupt adverse use). Nor would Pugatch's conversation with Saul Stoloff as to his intent regarding the boundary constitute a sufficient assertion of his claim to the lawn area to break the running of the prescriptive period. See *Van Allen* v. *Sweet, supra.*[9] Cf. *Woycik* v. *Woycik*, 13 Conn. App. 518, 525-526 (1988) (apprising adverse possessor of claim to disputed area by demand letter does not disturb possession without required entry under Connecticut statute).

The Stoloffs' lawn area, but for the addition of the railroad-tie retaining wall, existed as it was during Mrs. Pugatch's occupancy from June 27, 1969, when the Stoloffs purchased their lot, until April, 1990, when the plaintiff's contractor excavated the wall, the hedge, and the lawn back to the record boundary line. During that period, the plaintiff did not overtly interrupt the Stoloffs' possession under a claim of right. Neither the placing of corner stakes outside the tended yard nor the conversation that warned of future interference sufficed to interrupt the Stoloffs' exclusive possession of their yard. Not every assertion of ownership by the record owner suffices to stop the running of the statute. *Bowen* v. *Guild*, 130 Mass. at 123. "It is well recognized that the running of the statute is interrupted by the owner's entry on the land, if, and only if, this is made openly and under claim of right, with a clearly indicated purpose of taking possession." 4 Tiffany, The Law of Real Property § 1161, at 853 (3d ed. 1975). See 3 American Law of Property § 15.9, at 809 (1974) ("The usual elements of possession must be established, as in

---

[9]In *Van Allen*, the owner of land had a survey performed during the prescriptive period and discovered that his neighbor's retaining wall encroached on the land. Asserting that "[s]omething must be done," the owner gave notice of the survey to the neighbor who responded, "I do not want anything not belonging to me." Although the owner had an agreement, identifying the true boundary, prepared and sent to the neighbor, neither party signed it. On the judge's subsidiary findings, the Supreme Judicial Court concluded that the defendant had established her title by prescription to the portion of the owner's land on which the wall was situated, and that her statement of belief or understanding was irrelevant to her adverse possession claim. 239 Mass. at 574-575. See *Ottavia* v. *Savarese*, 338 Mass. 330, 334 (1959); *Kendall* v. *Selvaggio, supra* at 623-624; *Peck* v. *Bigelow*, 34 Mass. App. Ct. 551, 552 (1993). Here, as in *Van Allen*, the owner's failure to assert his claim so as to interrupt the prescriptive period allowed the adverse possessors' claim to mature.

the case of the entry by the adverse possessor, except that it need not be exclusive . . . . The owner's entry . . . cannot be accidental, casual, secret or permissive"). On the judge's findings, the Stoloffs' adverse possession of the tended yard portion of the disputed area was not effectively interrupted within the prescriptive period.[10]

· The judgment is to be amended in the trial court, after such further proceedings as may be necessary to specify terms, to declare, on count one of the counterclaim, that the Stoloffs are the owners by adverse possession of so much of the disputed area as constituted part of their tended yard, including the area occupied by the privet hedge and the railroad-tie wall[11]; and, on count two thereof, to order the plaintiff to restore, or to pay for the reasonable cost of restoring, the railroad-tie retaining wall and any excavated land and lawn within that area. At the Stoloffs' election, the order on count two may include restoration of so much of the privet hedge as was removed, or, alternatively, they may have treble damages therefor based on G. L. c. 242, § 7.[12] In all other respects, the judgment is affirmed.

*So ordered.*

---

[10]The cases suggest that the Stoloffs' adverse possession might have been interrupted by (a) driving a line of marked posts in the yard designating the boundary line, *Simmons* v. *Inhabitants of Nahant*, 3 Allen at 317; (b) connecting the corner stakes with a string, and posting a sign, *Pierce* v. *Austin*, 651 S.W.2d at 162-163; (c) obtaining the Stoloffs' signature on à letter acknowledging the true boundary line and their permissive use of the portion of their yard on the Pugatch side of the line, *Van Allen* v. *Sweet*, 239 Mass. at 574; or (d) commencing a legal action to establish title, see note 8, *supra*. Of course, the acts of the Pugatches' contractor in April, 1990, in digging out the Stoloffs' wall, privet hedge, and part of their lawn, would have effectively interrupted the Stoloffs' possession, if they had occurred within the prescriptive period.

[11]This is the 238 square foot area referred to in the judge's findings as the area shown on chalk B, marked by the line from G to H to G. See note 6, *supra*.

[12]The judge determined the value of the plants removed to be $900.